No. 47,158

MID-CONTINENT LIFE INSURANCE COMPANY, a corporation, *Appellant*, v. HENRY'S, INC., a Kansas corporation, LEO LEVITT and ISADORE LEVITT, *Appellees*.

(520 P. 2d 1319)

Opinion filed April 6, 1974.

*Paul R. Kitch*, of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Gerrit H. Wormhoudt* and *Willard B. Thompson*, of the same firm, were with him on the brief for the appellant.

*Walter C. Williamson*, of Kidwell, O'Keefe and Williamson, of Wichita, argued the cause, and was on the brief for the appellees.

The opinion of the court was delivered by

PRAGER, J.: This is a dispute between the lessor and lessee of a a commercial building as to who has the duty to rebuild an exterior wall. The action was brought by the plaintiff-appellant, Mid-Continent Life Insurance Company, as lessor, against Henry's, Inc., the defendant-appellee, as lessee. We will refer to the Mid-

Continent Life Insurance Company as Mid-Continent or plaintiff. We will refer to Henry's, Inc., as Henry's or defendant. The facts in this case are not greatly in dispute and are as follows: In the late 1940's Henry's Building Company, Inc. constructed a three-story commercial building for use as a retail clothing store. The building company had earlier acquired 99-year leases covering the store site. After completion the building was leased to a sister corporation, Henry's, Inc., which operated the store. Three brothers, Henry, Isadore and Leo Levitt, were the original owners and the only stockholders of both companies. The store building is located in the downtown area of Wichita. The store sits immediately to the south of the Bissantz building, another three-story structure which existed when the store was erected. The Bissantz building abutted directly on the property line and at the time of construction the north wall of Henry's building was built in close proximity to the wall of the Bissantz building touching it in a number of places. Because of the location of the Bissantz building's wall it was impossible to install exterior brick to finish the north wall of Henry's building. Instead a parapet was built between the roofs of the Henry's building and the Bissantz building so that the area between the two buildings was fully protected from the elements. As finally constructed the external face of the north wall of Henry's building consisted only of hollow tile. This was perfectly satisfactory so long as the wall was protected by the adjoining Bissantz building. Except for the penthouse area of the store building which houses the elevator shafts, the entire north wall was hidden from view by the wall of the Bissantz building.

In 1962 upon the advice of their tax consultant the Levitt brothers decided to sell the store building and enter into a sale-leaseback arrangement. The Levitt brothers through their agent got in touch with Mid-Continent and offered to sell their leasehold rights in the land and building to Mid-Continent for $1,050,000 with a leaseback to Henry's, Inc. for a 25-year term with a guaranteed rent of $80,000 per year, plus two percent of the annual gross sales in excess of $4,000,000. In the course of the negotiations the Levitts delivered the plans and specifications of the building to Mid-Continent for their examination. Mid-Continent employed an architect from Oklahoma City to inspect the building and to advise them as to its condition. Thereafter Mid-Continent purchased the leasehold interests and the building from Henry's Building Company, Inc. and

simultaneously entered into a lease agreement under the terms of which Henry's, Inc. leased the premises for a term of 25 years commencing July 1, 1962. It should be noted that the leasehold ownership in the land was based upon two 99-year leases, one of which terminated in the year 2023 and the other in 2028. Henry's, Inc. took possession under the lease effective July 2, 1962, and continued to operate its merchantile business as it had done for many years. The lessor and lessee got along very well and apparently had no serious problems.

The problem in this case arose in 1970 when the owners of the Bissantz building decided to remove its two-top floors. The contractor who was hired to remove the top floors of the Bissantz building discovered the unfinished condition of the north wall of Henry's building during the course of the construction work. Mr. Teall, the contractor, upon the discovery of the condition of the wall notified the Wichita City Inspection Department. Mr. Teall was advised that hollow tile on an exterior wall did not comply with the city building code. Mr. Teall immediately got in touch with one of the Levitt brothers and informed him that the north wall of the Henry's building was not in compliance with the city building code and that something had to be done. The Levitt brothers through their attorney advised Mid-Continent of the condition of the wall and took the position that it was the obligation of Mid-Continent, as lessor, to rebuild the wall. At this point the controversy between Mid-Continent and Henry's began. Whose obligation was it under the lease to rebuild the wall? Each of the parties pointed the finger of responsibility at the other. On one point there was complete agreement—the condition of the wall constituted an emergency situation and immediate steps should be taken to correct it. The parties agreed that Mr. Levitt should employ a contractor to proceed to rebuild the north wall but neither of the parties would waive its rights nor jeopardize its position that the responsibility for rebuilding the wall was on the other. Thereafter the wall was rebuilt with dispatch. Mid-Continent paid the contractor the cost of construction in the amount of $33,808.41. Henry's employed an architect for the project and paid his fee in the amount of $3,416.15. Each of the parties stood firm in its position that the cost of rebuilding the wall should be borne by the other. On July 7, 1971, Mid-Continent filed this action against Henry's for the recovery of the $33,808.41 which it had paid to the contractor. Henry's counter-claimed for the architect fees it had paid in the amount of $3,416.15.

After the issues were framed the case was tried to the court which entered judgment in favor of the defendant Henry's in the amount of the architect fees. The basis for the trial court's holding was that the obligation to rebuild the wall fell on the shoulders of the lessor Mid-Continent. The trial court made extensive findings of fact and conclusions of law which it incorporated in its judgment. Mid-Continent has appealed to this court.

The petition filed by Mid-Continent contained a cause of action in Count 1 based upon the rights and obligations of the parties under the written lease. It further contained a cause of action in Count 2 based upon alleged false representations made by the Levitts as to the condition of the north wall at the time the building was sold to Mid-Continent. The trial court found from disputed evidence that false representations had not been established. It is contended by Mid-Continent on this appeal that the trial court erred in so finding. Based upon the entire evidentiary record we have concluded that the findings of the trial court are supported by substantial, competent evidence and that the trial court did not commit error in finding against Mid-Continent on the issue of false representation.

The remaining point of error asserted by the appellant is that the trial court erred as a matter of law in failing to hold that, under the express terms of the lease, Henry's was required to assume the cost of restoring the north wall of the store building to first-class condition after the partial razing of the adjacent building. Furthermore Mid-Continent contends that the trial court's findings of fact and conclusions of law to the contrary are clearly erroneous.

This case must be determined on the basis of the rights and obligations of the parties arising from the landlord-tenant relationship as set forth in the written lease. Mid-Continent takes the position that the provisions of the written lease placed the duty to restore the wall on the lessee, Henry's. Mid-Continent relies specifically upon the following lease provisions:

"SECTION VI

"MAINTENANCE OF IMPROVEMENTS

"LESSEE shall at its expense, *except for damage by casualty*, maintain the *exterior* and interior of the improvements in a first class manner during the term of this lease. The replacement and renewal of floor coverings, mechanical equipment, and items of like nature, including decorations, necessitated by

obsolescence and ordinary wear and tear, shall be made by LESSEE at its sole cost,

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Provided that during the last 5 years of the term of this lease, *LESSEE shall only be obligated to restore, replace, maintain, to the extent necessary to return said premises to LESSOR in substantially the same condition as they now are,*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

LESSEE shall at all times protect LESSOR from liens and on such replacements and renewals not covered by insurance. Where the probable cost is in excess of $25,000.00, it shall furnish LESSOR bond to protect it against liens, unless such bond is waived in writing by LESSOR."

"SECTION I

"DEFINITIONS

"3. IMPROVEMENTS. The word 'improvements' means the buildings and all those integral parts thereof, and attachments thereto, located on the leasehold estates, except such as are excluded under the definition of the word 'fixtures.' "

"SECTION VII

"CONDUCT OF BUSINESS

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"LESSEE further covenants with LESSOR that it will not during the term of this lease, mortgage or otherwise hypothecate its fixtures or inventory except for the purpose of securing the purchase price of any such fixtures or the cost of remodeling or rebuilding fixtures, or remodeling or rebuilding the lease improvements without first having obtained the written consent of LESSOR."

"SECTION XV

"RIGHT TO INSPECT

"It is further covenanted and agreed that LESSOR shall at all reasonable times during business hours have free access to said leased premises for inspection as to the condition thereof; provided, however, that this right to inspect shall not in any way make the LESSOR responsible for *any condition* found with reference to said premises." (Emphasis supplied.)

In addition to the above lease provisions it should be noted that the lessee is made responsible for insurance, taxes, ground rental and special assessments.

Mid-Continent takes the position that the provisions of the lease clearly and unmistakably place the responsibility for making repairs and improvements to the exterior of the building on the lessee, Henry's, and presents an able and forceful argument in support of its position.

Henry's in support of its position contends that the duty placed upon the lessee is to *maintain* the exterior and interior of the improvement in a first-class manner during the terms of the lease. It points out that there is no provision in the lease which expressly states that either Mid-Continent or Henry's has the obligation to construct new *improvements* on the premises as required by public

authorities or public laws. In his brief counsel cites a number of cases from other jurisdictions which hold in effect that the word "maintain" means to repair or to keep in good condition things that exist and do not require the creation of something new. The word "maintain" does not mean to construct; it means to keep up, to keep from changing, to hold, to preserve in its present state or condition. Henry's contends that the exposure of the wall was not the result or caused by decay, erosion, or partial destruction; the problem resulted and arose solely from the removal of the two-top floors of the adjoining building and the demands of the city to rebuild the wall so as to comply with the city building code. Henry's freely admits its obligation under the lease to maintain the building and keep it in good repair. It denies, however, any responsibility to undertake substantial repairs and remodeling except as required in its ordinary business of retailing clothing. Essentially it asserts that the problem which occurred here was not within the contemplation of the parties at the time the lease was executed and hence must be determined on the basis of established principles of law pertaining to the landlord-tenant relationship.

In its findings of fact and conclusions of law the trial court found that there is no expressed statement in the lease concerning who, as between lessee and lessor, should bear the cost of the improvements made to the north wall, given the nature and extent of such improvements. The trial court further found that under the lease it was not the intent of the parties at the time the lease was executed for the lessee to have the duty, at its cost and expense, to construct substantial improvements on the premises.

There are many cases from other jurisdictions arising out of similar factual circumstances. Both of the parties rely to some extent on an Oregon case which reviews many of the cases and states the general principles to be applied in a dispute of this nature. (*Gaddis v. Consolidated Freightways,* 239 Or. 553, 398 P. 2d 749, 22 A. L. R. 3d 514.) *Gaddis* is followed in 22 A. L. R. 3d by an annotation on the subject of who, as between landlord and tenant, must make, or bear expense of, alterations, improvements, or repairs ordered by public authorities. In *Gaddis* the Oregon court first recognizes the general rule that in the absence of a provision in the lease to the contrary, the lessee has no obligation to repair. Such a rule is supported by *Garner v. Grocery Co.,* 102 Kan. 5, 169 Pac. 219. In *Gaddis* the court then summarizes the law as follows:

"We have examined all of the available authority on the subject and conclude, . . . that the criterion applied by the courts is briefly but fully stated in 1 American Law of Property, . . ." (1952, § 3.80 beginning at p. 353.) "Because the statement is concise we copy it in full:

" '. . . If the lessee does not expressly covenant to repair, it would seem clear that he generally should be under no duty to make alterations and repairs required by governmental authority in order to conform the premises to health and safety laws. Any changes likely to be ordered for this purpose would be beyond the scope of the tenant's common law duty to repair, and the expenses of compliance are properly regarded either as capital expenditures or as necessary carrying charges to be paid out of the rent.

" 'Where the lessee covenants to repair, the question of who should bear the cost of compliance depends upon the nature of the alteration or improvement and the reason for requiring it. If the order involves mere. repairs which the lessee would normally be required to make under his covenant, he should bear the cost. Likewise, the burden is on the lessee where the alteration is required only because of the particular use which he is making of the premises, although it may be questioned whether even in this case, the courts would place the burden of extensive and lasting improvements on the lessee, except perhaps where the lease is for a long term. At any rate, if the order requires the making of such improvements, so-called "structural" changes, and they are not required because of the particular use made of the premises by the lessee, the lessor must bear the burden of compliance.' " (pp. 557, 558.)

The court then stated that it had found no case which holds categorically that either the lessee or lessor is bound to make improvements or alterations required by governmental authorities and that each case must be determined on its own particular facts and circumstances.

We have found only one Kansas case which touches upon the problem presented here. In *Electric Service Co. v. City of Mullinville*, 125 Kan. 70, 262 Pac. 536, the city of Mullinville in Kiowa county, constructed a transmisison line from Bucklin to Mullinville for the purpose of supplying the inhabitants of Mullinville with electric light, heat and power, and constructed a distribution system within the city. The city leased the entire plant to an electric service company for operation and the service company agreed to maintain the transmission line in good operating condition. The transmission line was constructed on a public highway. During the term of the lease the board of county commissioners of Kiowa county desiring to widen the highway ordered the line removed. Pursuant to the order the line was removed and rebuilt on the addition to the highway made by widening it. A controversy arose between the electric service company and the city of Mullinville as to who should stand the expense of removing and

rebuilding the line. This court held that such expenses should be borne by the city as lessor and owner. In the opinion this court discusses the obligation of the lessee to make repairs where an event occurs not within the contemplation of the parties. The court quoted from *Baily v. De Crespigny*, 4 Q. B. 180 (1869) as follows:

"'We have first to consider what is the meaning of the covenant which the parties have entered into. There can be no doubt that a man may by an absolute contract bind himself to perform things which subsequently become impossible, or to pay damages for the nonperformance, . . .

"'But where the event is of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens.' (p. 185.)" (p. 72.).

Following this quotation Mr. Justice Burch points out that in this instance the contract was to *maintain* the transmission line. The ordinary meaning of the word "maintain" is to keep in a particular state or condition, especially with reference to efficiency; to support, to sustain, to keep up; not to suffer to fail or decline. The transmission line was completed and in existence on the public highway when the contract was signed, and there is nothing to indicate the location was not regarded as permanent. The nature of the contract clearly indicated that good operating condition was the specific character of maintenance contemplated. The opinion further states that demolition of the line and reconstruction at another location was something quite different from keeping it up to a standard of efficiency, and it is scarcely reasonable to extend the meaning of the word "maintain" to include such a remote and extraordinary contingency as that occasioned by the removal order. We held that the responsibility for bearing the expense of removal and reconstruction of the transmission line was not contemplated by the parties at the time the lease was entered into. Because the lessee did not contract to bear that unforeseen expense, it must be borne by the owner of the line.

In this case the trial court found that under the facts and circumstances the cost of reconstructing and rebuilding the north wall should be placed upon Mid-Continent as lessor and owner rather than upon Henry's as lessee. The rationale of the court is found in Finding of Fact 3 which states as follows:

"3. The Court finds from the evidence, with respect to the improvements made to the premises, that such improvements will survive the term of the lease between lessor and lessee; that such improvements are substantial and structural in nature; that such improvements will inure to the primary benefit of lessor during its reversion period of forty-one years; that such improvements were not required by or because of any particular use made of the premises by lessee, and that the costs of such improvements were substantial as opposed to nominal."

In our judgment the trial court properly considered the tests and rules of law to be applied in a dispute of the nature involved here. The court considered the significant factors and under all the facts and circumstances its judgment that Mid-Continent as lessor should bear the cost of rebuilding the wall is reasonable and just. Clearly the necessity of rebuilding the north wall arose only because of the removal of the two upper stories of the Bissantz building. The event which necessitated the improvement was unusual, extraordinary and clearly unexpected. The trial court properly found under the evidence that such a contingency was not within the contemplation of the parties at the time the lease was executed. Under the circumstances we find no error in the trial court's determination of this case. The judgment is affirmed.