672 P.2d 1137

Dave HENDREN, Plaintiff-Appellant,

v.

**ALLSTATE INSURANCE COMPANY,**
**Defendant-Appellee.**

No. 7140.

Court of Appeals of New Mexico.

Nov. 1, 1983.

Paul S. Wainwright, Gregory V. Pelton, Robinson, Stevens & Wainwright, P.A., Albuquerque, for plaintiff-appellant.

Stephen M. Simone, Farlow, Simone & Roberts, Albuquerque, for defendant-appellee.

## OPINION

BIVINS, Judge.

Plaintiff sued to set aside a settlement made with defendant under the uninsured motorist provisions of a policy insuring plaintiff, and also to declare the limits of liability under that coverage as of the date of plaintiff's accident. From a summary judgment in favor of defendant, plaintiff appeals claiming the existence of genuine issues of material fact. We agree and reverse.

At the time of his accident plaintiff was an insured under an automobile policy issued by defendant to plaintiff's father. The policy covered either two or three automobiles, a point in dispute, and provided uninsured motorist coverage of $15,000 for bodily injury per person and $5,000 property damage.

In deciding whether summary judgment was proper, we must view the matters presented in the light most favorable to support the right to trial on the merits. *C & H Const. & Paving Co. v. Citizens Bank,* 93 N.M. 150, 597 P.2d 1190 (Ct.App.1979). With this in mind, we examine the affidavits plaintiff submitted in opposition to the summary judgment motion.

Plaintiff's own affidavit reveals the following facts. On May 19, 1981, plaintiff was injured in an automobile accident with an uninsured motorist. He received severe injuries, including simple fracture of the right femur, compound fracture of the right distal tibia, fractured left ankle, visual problems, extensive scarring of the right shin, left ankle, right hip and back. A screw was placed in the left ankle which is probably permanent.

A month after the accident a claims adjuster for defendant contacted plaintiff, who at that time had been released from the hospital and was convalescing at his father's home. The adjuster took plaintiff's statement, questioning him extensively about his injuries and medical expenses. Plaintiff says the adjuster told him that she was "going back to the home office of Allstate and try to convince them to pay the maximum amount under the insurance coverage," which she said was $15,000. On a subsequent visit the adjuster advised plaintiff "that the home office had agreed to pay the maximum that it was required to pay under the insurance policy." She further advised him that "$15,000.00 was all ... [he] could get from Allstate." Plaintiff agreed to a settlement of $15,786 (presumably the $786 was for either property damage or medical); he and his father executed

a receipt and release, and a trust agreement. In the first document plaintiff released defendant from all liability arising from the uninsured motorist coverage of the policy. Plaintiff states that at the time he executed these documents, "I was advised and was under the impression, given to me by the adjustor, Joan Pearl, that this was all that I could receive from Allstate Insurance Company and that therefore my retaining an attorney to represent me in negotiating with Allstate would be a waste of money." Plaintiff's father, who was present during the discussion with the adjuster, stated in his affidavit that he was advised or under the impression that the agreed sum was all his son could receive from defendant under the uninsured motorist coverage provisions of the policy.

Plaintiff and his father both were unaware that defendant was providing coverage for the uninsured motorist, that is, negotiating from an adversary position, and both believed that defendant was representing plaintiff's best interests.

Defendant did not controvert these affidavits but did file an affidavit which reflects that two, rather than three, automobiles were described in the policy. We do not concern ourselves with this discrepancy. For the purposes of our review, we note only that no dispute exists as to whether more than one automobile was insured under the policy.

Plaintiff signed the release and trust agreement on June 24, 1981. On March 12, 1982, the Supreme Court decided *Lopez v. Foundation Reserve Ins. Co., Inc.,* 98 N.M. 166, 646 P.2d 1230 (1982), which recognized "intra-policy stacking", that is, aggregating uninsured motorist coverage when a single policy covers more than one automobile. Defendant does not challenge plaintiff's assertion that he could have stacked his uninsured motorist coverage had *Lopez* been decided before the settlement. Thus, if plaintiff can show grounds for voiding the settlement, he will have bodily-injury coverage under the policy of either $30,000 or $45,000, depending on whether it described two or three automobiles. For the purposes

of summary judgment, defendant does not question that plaintiff's injuries and damage could support a recovery in excess of $15,786.

Generally, in order to set aside or avoid a written release, there must be evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake, and such evidence must be clear and convincing. *Mendenhall v. Vandeventer,* 61 N.M. 277, 299 P.2d 457 (1956); *Woods v. City of Hobbs,* 75 N.M. 588, 408 P.2d 508 (1965). Plaintiff claims mutual mistake of fact and law and misrepresentation. In reviewing this case we bear in mind that the public policy of this State favors the "amicable settlement of claims without litigation when the agreements are fairly secured, are without fraud, misrepresentation, or over-reaching, and when they are supported by consideration." *Ratzlaff v. Seven Bar Flying Service, Inc.,* 98 N.M. 159, 646 P.2d 586 (Ct.App.1982).

At least one state has permitted the avoidance of a settlement and release by giving retroactive effect to its decision which recognized "stacking". *Bradbury v. Aetna Cas. & Sur. Co.,* 19 Wash.App. 66, 573 P.2d 395 (1978), *aff'd* 91 Wash.2d 504, 589 P.2d 785 (1979). We decline to follow that approach for two reasons. First, *Lopez* did not change existing law; it resolved an unsettled point of law. Thus, retroactive application is not involved. Second, neither *Bradbury* decision addresses a policy of encouraging settlement agreements. As noted above, the policy of this State favors settlement. *Ratzlaff.*

Plaintiff claims that he signed the release under a mistake of fact and law and that defendant induced him to sign by a misrepresentation of its claims adjuster who knew, or should have known, of defendant's greater liability for coverage and failed to so advise plaintiff.

MISTAKE OF FACT OR LAW

In *Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.,* 84 N.M. 524, 505 P.2d 867 (Ct.App.1972), we said, "A mutual mistake exists where there has been a

meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties." (Citations omitted.) There is no evidence that the agreement in its written form did not express the intent of the parties. This contention fails.

Likewise, plaintiff's claim of mistake of law must fail. A similar argument was made but rejected in *Esquibel v. Brown Construction Company, Inc.,* 85 N.M. 487, 513 P.2d 1269 (Ct.App.1973).

MISREPRESENTATION

■ We turn to plaintiff's claim based on misrepresentation. In *Prudential Insurance Company of America v. Anaya,* 78 N.M. 101, 428 P.2d 640 (1967), the Supreme Court held, "As a general proposition, rescission is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." And in *Modisette v. Foundation Reserve Insurance Co.,* 77 N.M. 661, 427 P.2d 21 (1967), the Supreme Court said, "[I]f misrepresentations be made, or information withheld, and such be material to the contract, then it makes no difference whether the party acted fraudulently, negligently, or innocently." (Citations omitted). 77 N.M. at 667, 427 P.2d 21. *Modisette* quoted with approval the following from *Metropolitan Life Ins. Co. v. Becraft,* 213 Ind. 378, 12 N.E.2d 952 (1938):

"Whether there was fraudulent intent or actual fraud is immaterial. An unqualified statement that a fact exists or does not exist, made for the purpose of inducing another to act, implies that the person who makes it is acquainted with the facts; and, if action is induced by the representation and false statement, the law will impute to him who made the false representation a fraudulent purpose. * * * It is the injury caused by the misrepresentation of fact that the law protects against. If the misrepresentation was brought about by forgetfullness [sic] or mistake it is just as injurious as an intentional fraud. It accomplishes a

fraud upon the other contracting party by inducing him to act upon a false premise, where he would not have acted had he known the truth. Whether it be caused by negligence, or actual fraudulent purpose, good intention or bad, the result is the same. There is no meeting of the minds * * *."

■ Here we have an adjuster affirmatively advising the insured as to the maximum amounts recoverable under the uninsured motorist provisions of the policy. The adjuster should have realized that the plaintiff would rely on the representation, since the face of the policy reflected $15,000 coverage notwithstanding multiple automobiles. Defendant asserts that plaintiff's affidavits do not demonstrate reliance on the representation as to policy limits. *See Prudential.* We disagree. Although suffering with severe injuries, plaintiff did not seek legal advice, because the defendant's agent told him it would be a waste of money. His inaction permits an inference of reliance.

■ In *Prudential,* the Supreme Court said that a misstatement is material if it takes away the party's opportunity to estimate his risk under the contract. Applying this definition, a fact finder in this case could determine that an unqualified affirmative statement as to the maximum limits of coverage was material.

In reviewing plaintiff's claim, we must determine the nature and extent of defendant's duty to plaintiff. This Court specifically considered the constructive fraud form of misrepresentation in *El Paso Natural Gas Co. v. Kysar Ins. Agcy., Inc.,* 93 N.M. 732, 605 P.2d 240 (Ct.App.1979).

The Supreme Court has defined constructive fraud as "... a *breach of a legal or equitable duty* irrespective of the moral guilt ... it is not necessary that actual dishonesty of purpose nor intent to deceive exist."

*Id.* at 735–736, 605 P.2d 240 (citation omitted) (emphasis added).

We recognize that an insurer has a dual role with respect to uninsured motorist coverage. The hybrid nature of the role which

an insurer who provides uninsured motorist coverage assumes, has caused a fragmented body of case law to emerge in which courts consider the duty owed by the insurer to the insured with varying results. *See e.g., Richardson v. Employers Liability Assurance Corp.,* 25 Cal.App.3d 232, 102 Cal.Rptr. 547 (1972) (holding a duty of good faith is implied in law with respect to uninsured motorist coverage, based on the reasonable expectation of the insured under such protection); and *Baxter v. Royal Indemnity Company,* 285 So.2d 652 (Fla.App.1973) (holding it immaterial when a policy provides for arbitration that insurer's demand for arbitration was motivated by bad faith, self-interest, malice, spite or indifference). The difficulty arises because the insurer, on the one hand, sold the policy and thus has an obligation to its insured, unlike third-party coverage situations. On the other hand, however, the insurer assumes an adversary role as to questions involving the uninsured motorist's negligence and any available defenses he might have. This dual capacity was addressed in *Craft v. Economy Fire & Cas. Co.,* 572 F.2d 565 (7th Cir.1978), where the court held:

> Uninsured motorist coverage represents substituted liability only in the sense that a determination that the uninsured motorist is legally liable to the insured is a condition precedent to the obligation of the insurer to pay off on the policy. In this determination the insurer stands in the shoes of the uninsured motorist with regard to the question of whether the latter was negligent and with regard to his defenses such as contributory negligence. This does not make the insurance company an insurer *in fact* of the uninsured motorist. Their relationship is not characterized by the rights and duties normally incident to the relationship between an insured and his insurer under a third party liability policy. Moreover, it does not make the insurer a stranger to its insured. After all, the insured is the one who pays the premiums for the uninsured motorist protection and the "reasonable expectation" that he will be dealt with fairly and in good faith by his insurer is still present. (Emphasis in original.)

The court in *Craft* also said, "It does not necessarily follow that the insurer is completely free of any obligation of good faith and fair dealing to its insured, since the latter duty is based on the reasonable expectations of the insured and the unequal bargaining positions...." *Id.* at 569.

■ We adopt the *Craft* view and hold that in spite of its adversary interest, an insurer continues to have a duty to deal fairly and in good faith with its insured in settling a claim under the uninsured motorist provisions of the automobile insurance contract. *See MFA Mut. Ins. Co. v. Flint,* 574 S.W.2d 718 (Tenn.1978). Defendant does not challenge this duty, stating that "Allstate owed Mr. Hendren a duty to deal fairly and honestly with him, which included the duty not to deceive him." The rule we adopt does not mean that the insurer is precluded from defending the uninsured motorist or from evaluating the claim any differently than it would have had it provided third party coverage. What it does mean, however, and particularly as applied to this case, is that the insurer must deal in good faith and fairly as to the terms of the policy and not overreach the insured, despite its adversary interest. Recognition of this duty accords with *Modisette.*

■ Defendant argues that there was no way it could have known that New Mexico would allow intra-policy stacking. While defendant may not have been able to anticipate with certainty that New Mexico would adopt intra-policy stacking, a fact finder could determine that it was aware, or reasonably should have been aware, that such aggregating of coverage would likely be adopted in this state. *Lopez* adopted the same reasoning applied *Sloan v. Dairyland Insurance Company,* 86 N.M. 65, 519 P.2d 301 (1974), which recognized inter-policy stacking. *Lopez* noted the clear trend in other jurisdictions has favored stacking. In addition, from the time *Sloan* was decided in 1974 to the date of the settlement and release in this case, the issue of intra-policy stacking had been resolved against defend-

ant in at least five cases. *See St. Arnaud v. Allstate Ins. Co.,* 501 F.Supp. 192 (S.D.Miss. 1980); *Hague v. Allstate Ins. Co.,* 289 N.W.2d 43 (Minn.1979); *Allstate Ins. Company v. Morgan,* 59 Haw. 44, 575 P.2d 477 (1978); *Allstate Ins. Co. v. Maglish,* 94 Nev. 699, 586 P.2d 313 (1978); *Yacobacci v. Allstate Ins. Co.,* 33 Conn.Supp. 229, 372 A.2d 987 (1976). With that experience, defendant could not with impunity make *affirmative* unqualified representations that $15,000 was the maximum limit of coverage under the uninsured motorist provisions where multiple automobiles were listed in the policy. Significantly, coupled with this representation, the plaintiff was advised, or under the impression, that he need not retain an attorney.

To reveal some information on a subject triggers the duty to reveal all known material facts. *Wirth v. Commercial Resources, Inc.,* 96 N.M. 340, 630 P.2d 292 (Ct.App. 1981). Thus, if the adjuster was going to affirmatively state the maximum limits, then, with the knowledge of defendant as to intra-policy stacking, she should have revealed to the insured the legal situation regarding policy limits.

■ Defendant argues that to require claims adjusters to advise insured claimants of possible legal interpretations and judicial decisions would not only create an impossible burden, but would inhibit compromise settlements and in effect, require adjusters to engage in the unauthorized practice of law. Our holding here requires no such affirmative action. An insurer must, however, correctly state policy limits and uncertainties, when it takes it upon itself to offer advice. Had the adjuster here simply told plaintiff that defendant believed the maximum coverage was only $15,000 but that New Mexico courts might rule otherwise, and *not* advised against plaintiff seeking legal counsel, then the outcome would perhaps have been different. The combination of those statements gives rise to a fact issue.

Defendant argues that before the decision in *Lopez* had been rendered "Allstate was perfectly within its rights to take the position that it would not stack intra-policy uninsured motorist coverages, and that the maximum Allstate would pay would be $15,000." If that was all defendant had done here, we might be inclined to agree. But when it took it upon itself to represent the maximum limits, it had a duty to state the true circumstances.

Defendant forcefully argues that if plaintiff is allowed to set aside the settlement, then the same rationale would permit claimants to invalidate settlements made in reliance on the law prior to this State's adoption of comparative negligence in *Claymore v. City of Albuquerque, aff'd sub nom, Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981). Further, defendant asks whether insurance companies and others who "overpaid" their share based on joint and several liability before *Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 646 P.2d 579 (Ct.App.), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982), can now sue to rescind and recover for overpayments. While these arguments have a certain appeal, they overlook obvious differences. *Claymore* and *Bartlett* changed well-settled law; *Lopez* resolved an unsettled but not wholly unpredictable question. Moreover, misrepresentation, which is claimed here as a ground for rescission, could not likely be proven in the examples given. The situations defendant cites are more like that in *Esquibel v. Brown Construction Company, Inc.,* 85 N.M. 487, 513 P.2d 1269 (Ct.App.1973).

We reverse the summary judgment and remand for trial on the merits as to the issue of misrepresentation. Appellate costs are assessed against defendant.

IT IS SO ORDERED.

WOOD and DONNELLY, JJ., concur.